United States District Court
Southern District of Texas

**ENTERED**

April 07, 2026

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARIA ANGELICA CASTILLO,           §
                                   §
        Plaintiff,                 §
                                   §
VS.                                §   CIVIL ACTION NO. 2:24-CV-00053
                                   §
KLEBERG COUNTY, TEXAS, *et al.*,   §
                                   §
        Defendants.                §

**ORDER ON KLEBERG COUNTY'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Maria Angelica Castillo (Castillo) brings this action in her individual capacity and on behalf of the estate of Cynthia Marie Garcia (Garcia) and on behalf of the heirs or wrongful death beneficiaries of Garcia for damages arising out of Garcia's overdose death. D.E. 56. Castillo sues Defendant Kleberg County, Texas (the County) under 42 U.S.C. § 1983 for violation of Garcia's Fourteenth Amendment right to due process, seeking survival and wrongful death damages.[1] At issue is Garcia's right to receive reasonable medical and mental healthcare, to be protected, and not to be punished while held as a pretrial detainee in the Kleberg County Jail. D.E. 56, pp. 32-37.

Before the Court is Defendant County's motion for summary judgment (D.E. 67), together with Plaintiff Castillo's response (D.E. 93), the County's reply (D.E. 99), and

---

[1] Castillo's pleading includes claims against Christus Spohn Health System Corporation d/b/a Christus Spohn Hospital – Kleberg, which are not relevant to the current motion.

1 / 24

Castillo's sur-reply (D.E. 109). The County challenges Castillo's ability to prove the elements of her claim, particularly as to causation, the existence of an unconstitutional policy, and the evidence necessary to show that conditions of confinement or episodic acts were unconstitutional. Castillo defends her claims, citing specific evidence and authorities on the standards to be applied to that evidence. The County objects to certain portions of Castillo's proffered evidence. For the reasons set out below, the Court **OVERRULES** the evidentiary objections and **DENIES** the motion (D.E. 67).

## STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In making its

2 / 24

determination, the court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp*., 278 F.3d 448, 451 (5th Cir. 2002). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Id*.

## EVIDENTIARY OBJECTIONS

The County does not object to any particular exhibit. Instead, it objects on the basis of relevance to the Court's consideration of the substance of any exhibit to the extent that it details matters of which the County did not know. For instance, the County objects to recitations regarding the hospital's intake, diagnosis, and treatment of Garcia as matters in which the County and its officials did not participate. Likewise, the County objects to any use of law enforcement officers' observations as they are not County employees.

The Court understands the County's concern that the hospital information was not within the County's knowledge. Indeed, Castillo's arguments are premised in large part on the fact that the County did not have, and made no effort to gain, this knowledge. However, the evidence remains relevant to show what the County could have learned, had it made an attempt to do so. And it provides some context regarding Garcia's condition at or near the time she presented at the county jail—her observable incapacity.

To the extent that the law enforcement officer describes Garcia's observable condition at intake (a matter he communicated to jail personnel and which is largely

corroborated by County personnel), it is relevant to the reaction of the County employees involved in intake. Indeed, the County states, "It is undeniable that the decedent was medically questionable when she arrived at the jail. . . . Jail staff recognized that the decedent was medically questionable . . . ." D.E. 99, p. 5.

The Court **OVERRULES** the objections, in part, because the evidence is relevant to show the context of the County's actions. The objections are further **OVERRULED**, in part, as moot because the Court does not take the evidence as indicating any County employee's personal knowledge beyond showing what was "undeniably" observable at intake.

## DISCUSSION

Castillo's claims against the County are based on municipal liability, as defined by *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a plaintiff must show (1) an official policy or a custom or practice that is so widespread and pervasive as to represent official policy, (2) effectively enacted by a policymaker, (3) which was the moving force behind a constitutional violation. There is no dispute that the Sheriff is the policymaker for the County with respect to the events that occurred in connection with the county jail. The County's first challenge is to causation. The challenges to the existence of a policy follow.

### A. Causation

**Standard for Causation**. According to *Monell*, causation under 42 U.S.C. § 1983 is demonstrated when the errant policy is the "moving force" behind a constitutional

violation. 436 U.S. at 694. This causation has been described in several ways. A plaintiff "must demonstrate *a direct causal link* between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis added). "At the very least there must be *an affirmative link* between the policy and the particular constitutional violation alleged." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) (emphasis added). And "the entity's 'policy or custom' must have *played a part* in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis added). Consequently, there may be more than one cause of a constitutional violation.

Indeed, Castillo defends against the global challenge to causation, observing that, in § 1983 jurisprudence, the standard is not that each independent action or policy must be the sole, exclusive cause. Instead, liability may be predicated on a number of causes compounding their effect by working together to constitute a substantial factor behind a constitutional violation. D.E. 93, p. 25 (citing *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 795 (5th Cir. 2020) (citing *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018) (any policy may merely "play a part" in the constitutional violation and have causative force)). If there is sufficient evidence that one or more County actions or policies worked independently or together as "a moving force" behind unconstitutional conditions, the Court may reject the County's global challenge to causation and its attempt to shift all causation to the hospital's physician.

**The Parties' Causation Theories**. The County challenges causation globally, on the basis that its conduct could not have been the moving force or played any part in any constitutional violation. Instead, the County points out that the hospital's emergency room physician, Dr. Valmont, issued a medical clearance allowing police to transport Garcia to the county jail for detention. D.E. 67, p. 5. The County characterizes the medical clearance—a medical malpractice issue—as the sole, or intervening and superseding,[2] cause of Garcia's death, thus precluding the ability of the County's conduct to represent the proximate cause or cause-in-fact of any damages. *Id*.

The County's argument requires the Court to accept as a matter of law its theory of the case—based on certain expert opinions—that Garcia's death resulted because she was not kept at the hospital where her condition would have been closely monitored and medical intervention would have been readily available. In contrast, Castillo contends—also based on expert opinions—that Garcia would not have died if (after Dr. Valmont issued the medical clearance) county jail personnel had either (1) refused to accept Garcia and, instead, sent her to a medical facility for additional medical evaluation and stabilization, or (2) provided appropriate evaluation, medical monitoring, and/or intervention for Garcia while she was housed in the county jail.

In support of Castillo's first theory there is some evidence that, after she had been medically cleared, Garcia's condition deteriorated, consistent with known consequences of

---

[2] As Castillo observes, the County does not brief concepts of intervening and superseding cause other than to name them as a basis for summary judgment. *See* D.E. 93, p. 25. The Court deems those arguments waived for failure to brief.

6 / 24

her olanzapine overdose. There is also some evidence in support of Castillo's second theory that county jail personnel failed to adequately evaluate Garcia's condition, had the means for closer medical monitoring but failed to exercise it, and knew that Garcia was lying in her cell vulnerable to positional asphyxiation and did not reposition her. The County's causation challenge does not refute the sufficiency of Castillo's evidence. It merely takes the position that it did not matter what the County did or did not do, once Garcia was medically released. The County's logic does not hold unless the County was powerless to (a) return Garcia or (b) provide the medical care necessary. Neither proposition is true.

**Compelled Reliance**. The County states that it was entitled to rely on Dr. Valmont's medical clearance and could not reject Garcia when law enforcement brought her to the jail. *See* D.E. 67, pp. 7-8. The County cites three cases in support of this proposition: *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Waldrop v. Evans*, 681 F. Supp. 840, 849 (M.D. Ga. 1988), *aff'd*, 871 F.2d 1030 (11th Cir. 1989); *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995). *See* D.E. 67, pp. 14-15. These cases are not helpful.

In *Hamilton*, the Ninth Circuit couched the matter in terms of ***reasonable*** reliance on a medical determination. It ultimately held that the defendant's reliance was not reasonable under the circumstances presented. Reasonable reliance is an issue of fact. *Matter of Coston*, 991 F.2d 257, 260 (5th Cir. 1993) (en banc) (reviewing the question in different contexts and in different circuits (including the Ninth Circuit) and aligning with prevailing treatment of reasonable reliance as a fact question). As such, it is not a proper issue for summary judgment on this record.

7 / 24

In *Waldrop*, the superintendent and commissioner were not individually liable because they were laypersons, the jail was adequately staffed with medical personnel, and treatment protocols were followed. In that context, their reliance on a medical opinion was not a matter of deliberate indifference. However, here, there is evidence that the jail was not adequately staffed with medical personnel. Nor did they conduct an evaluation or know what treatment protocols were deemed medically necessary. The only nurse on duty was concerned about Garcia's condition as a potential in-custody death and the only doctor on staff did not evaluate Garcia. D.E. 93-7, p. 8. Moreover, the jail personnel did not have access to the hospital's medical records so as to know Garcia's prior diagnoses and necessary treatment. *Waldrop* is not sufficiently analogous to the facts of this case to provide any conclusion as a matter of law.

*Shakka* is likewise inapposite. There, laypersons relied on a medical authority's order to temporarily remove a wheelchair for the safety of the patient as well as others. Whether prison officials had the authority to take action contrary to the physician's recommendation was an issue that the court observed had not been raised. Here, Castillo has raised numerous arguments that jail officials did not seek or obtain treatment or discharge orders from Dr. Valmont and had the authority to evaluate and treat Garcia. Therefore, this Court cannot conclude as a matter of law that jail officials were bound to follow any order or that their actions were consistent with any such orders.

**Power to Treat**. There is no argument that the county jail was incapable of making a medical evaluation of Garcia or responding to her readily apparent condition when

presented to the jail. Castillo argues, and the County does not dispute, that the jail could have monitored Garcia more closely and quickly intervened to reposition her, ensure that she continued breathing, or resuscitate her if her respiration or heart stopped. Thus, the Court cannot conclude as a matter of law that jail officials could not have done more to treat Garcia. Nothing about the medical clearance they received prevented such action.

**Foreseeability**. The County states that it was not foreseeable that "complying with a treating physician's instructions would lead to the death of the patient." D.E. 67, p. 8. Yet it offers no evidence that the County received any such instructions. The medical clearance was a release to transport and detain. It contained no other instructions, and this was common. *See* D.E. 67, p. 3; D.E. 93, Ex. 19 at 45:4-8. And while there is conflicting evidence whether the hospital gave the law enforcement officer discharge instructions, Castillo asserts, and the County does not dispute, that there is no evidence to show that those instructions were provided to anyone at the jail. *See* D.E. 93, Ex. 9 at 49:19-50:5; Ex. 14 at 57:2-12. Therefore, the assertion that the County faithfully followed those directions is not a proposition that the Court can accept as a matter of law on this record.

Even if simply monitoring Garcia had been the instruction, Castillo has offered evidence that the efforts made to monitor Garcia were so perfunctory as to be ineffective. They looked through a window and did not take any vital signs, check her breathing, or take any precautions against positional asphyxiation and they did not report what they observed. *See e.g.,* D.E. 93, Ex. 9 at 19:1-4, 13-15; Ex. 10 at 33:12-25, 34:14-19; Ex. 17 at 30:17-22; Ex. 24. Jailers would not do anything unless an inmate made a medical

9 / 24

complaint, even though they knew that people who were suicidal or having medical issues were at higher risk. D.E. 93, Ex. 8 at 29:1-21; Ex. 10 at 34:20-23. Nothing in the evidence supports the conclusion as a matter of law that merely glancing in a window—more often than the jail's guidelines might require—constitutes following instructions for medically monitoring a patient subject to respiratory and cardiac complications. The Court rejects the County's argument that Garcia's death was not foreseeable because its personnel followed treatment instructions from a physician.

**Cause in Fact**. Last, the County argues that there can be no cause in fact attributable to the County because Garcia's death was only because she was absent from the hospital. D.E. 67, pp. 8-9. The County's argument that it would have been futile for the jail to send Garcia back to the same hospital that had already cleared her once is nothing more than speculation. It cites no evidence that, had the jail sent Garcia back for reevaluation, the physician would not have performed such a reevaluation and would not have found new medical reasons for providing additional monitoring, intervention, or stabilization as the overdose proceeded through its course. And it does not address whether there were other medical facilities to which the County could send Garcia. It further offers no legal authority that jail personnel are precluded from or relieved of taking such action, as may arise or be noticed during its staff's actions on intake, including lay observations.

**Conclusion**. What we have is a classic disputed issue of material fact on causation. When there are fact-supported competing theories of the case in a summary judgment proceeding, the Court cannot judge the credibility of the witnesses or weigh the evidence

to arrive at a winner. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). "Even uncontradicted expert opinion testimony is not conclusive, and the jury has every right not to accept it." *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1470 (11th Cir. 1989) (citing *Remington Arms Co., Inc. v. Wilkins*, 387 F.2d 48, 54 (5th Cir. 1967)).

For all of these reasons, the motion for summary judgment is **DENIED IN PART** with respect to the global challenge to causation on the premise that the only effective cause was Dr. Valmont's conduct in medically releasing Garcia.

## B. Conditions of Confinement

According to the Fifth Circuit, in a case brought on behalf of a pretrial detainee, proof of an unconstitutional condition of confinement involves three elements:

> (1) a rule or restriction or the existence of an identifiable intended condition or practice or that the jail official's acts or omissions were sufficiently extended or pervasive;
>
> (2) which was not reasonably related to a legitimate governmental objective; and
>
> (3) which caused the violation of a detainee's constitutional rights.

*Estate of Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 308–09 (5th Cir. 2020) (cleaned up; citations omitted).

**Policy, Custom, or Practice**. In its motion, the County challenges the first element on three bases: (a) Castillo does not identify any unconstitutional conditions; (b) the only express policies applicable to the jail are constitutional on their face and a claim cannot be predicated on any single violation of those policies; and (c) there is no evidence of a sufficiently pervasive de facto policy that is unconstitutional. D.E. 67, pp. 9-12. Castillo

11 / 24

responds that her conditions of confinement claim is based on de facto policies and the Court addresses only that theory. D.E. 93, p. 8. "[T]he medical care a prisoner receives is just as much a "condition" of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." *Hare v. City of Corinth, Miss*., 74 F.3d 633, 644 (5th Cir. 1996) (quoting *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)).

> The *Hare* opinion addresses unconstitutional intent as follows:

> In true jail condition cases, an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or restriction. ***A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction.*** Likewise, even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices. Thus, a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation.

*Hare*, 74 F.3d at 644–45 (emphasis added). Therefore, Castillo's demonstration of an offending policy does not require separately demonstrating any individual's deliberate indifference.

Castillo notes that she can make the necessary showing of de facto policies through evidence of "(1) pervasive practices; (2) consistent testimony and behavior of jail employees; (3) TCJS reports; (4) failures to reprimand; or (5) a 'mutually enforcing effect' of multiple interacting policies." *See* D.E. 93, p. 8. (citing *Sanchez*, 956 F.3d at 792-93 (detailing types of evidence that supports a de facto policy and collecting cases)). The focus

in such claims is on broad policies that are treated as unconstitutional conditions of confinement, even though they may engender no more than one unconstitutional individual act or omission. *Cope v. Coleman Cnty*., No. 23-10414, 2024 WL 3177781, at *8-9 (5th Cir. June 26, 2024) (per curiam), *cert. denied*, 145 S. Ct. 1061 (2025). Staffing policies are one such example. *See id.* (citing *Garza v. City of Donna*, 922 F.3d 626, 633 (5th Cir. 2019) and collecting cases on understaffing as a condition of confinement).

In this vein, Castillo cites the following evidence of types of county jail practices or customs that amount to unconstitutional policies:[3]

- The jail accepted anyone with a medical clearance without independent assessment or discharge instructions, such that they would not know what medical condition or emergency they or the detainee might be facing.

  o The hospital frequently cleared people who were unable to walk on their own, and they would be taken to the jail. (Ex. 13 at 50:23-51:5 ["Intoxicated people do that a lot."]).

  o It was a "common occurrence" for patients to arrive at the jail incoherent, sleepy, tired, but they were accepted just because they had medical clearance. (Ex. 8 at 36:5-11) It also was not typical to have separate discharge instructions: medical clearance was the only required form for acceptance. (Ex. 19 at 45:4-8).

  o As long as the person had a medical clearance form, they were accepted into the jail no matter what, which has been the policy the entire time Sheriff Kirkpatrick has been in office. (Ex. [8] at 34:16-23, 36:1-17; Ex. 11 at 22:14–23:2; Ex. 14 at 51:17–52:12; 55:12-20) The medical clearance form is brought by the arresting officer and is required if "it's questionable" whether someone should be accepted into the jail. (Ex. [9] at 16:4-20; 17:1-7; Ex. 18

---

[3]  The following description of the evidence consists of verbatim excerpts from Castillo's response (D.E. 93). In verifying the representations of the evidence, the Court discovered that two exhibits were reversed. Therefore, the Court has reversed the references to "Ex. 8" and "Ex. 9." All exhibits are cited by the exhibit number appearing on the document as filed, regardless of CM/ECF designation.

13 / 24

at 20:19-25) But the nurse would not look at anything else to determine whether to admit someone. (Ex. [9] at 16:4-20, 17:1-7).

o Jailers were not required to have discharge paperwork from the hospital in order to accept someone into the jail. (Ex. 14 at 57:2-12) So no one at the jail knew what treatment, if any, Cynthia had received at the hospital. (Ex. [9] at 49:19-50:5).

o Nurse Hack could not get medical records from the hospital because she does not have access even though it was necessary for her to be able to verify treatment information for patients. (Ex. [9] at 37:7-14, 37:18-24, 40:24-41:5) This issue arose "almost every single day." (*Id*. at 39:16-19).

o But frequently, as in Cynthia's situation, Nurse Hack did not receive discharge instructions: it happened "every time [she] had an inmate that came in from the hospital." ([Ex. 9] at 42:9-16) In fact, Dr. Ugarte testified that the nurse would never receive discharge instructions, only the medical clearance form. (Ex. 19 at 45:4-8).

o Medical records often took time to get and had to be requested from the hospital. (Ex. 19 at 26:21-27:22). But no one contacted the hospital to get more information regarding Cynthia. (Ex. [9] at 68:6-8; Ex. [8] at 39:8-12) This was not something jail supervisors were ever expected to do. (Ex. [8] at 39:13-18, 39:23-40:3).

o County employees never even discussed sending Cynthia back to the hospital. (Ex. 12 at 49:17-21; Ex. 18 at 55:3-7).

o Correctional standards require individuals who are severely under the influence to be returned to the hospital or a psychiatric facility. ([Ex. 22, p. 12]) "Any reasonable and well-trained correctional staff in the same position would have returned Ms. Garcia to the hospital, rather than placing her in a cell at the jail." (*Id*. at 12, 13).

- The jail frequently houses intoxicated and/or overdosing detainees without detox protocols.

o Often people come in sleeping like Cynthia when they are under the influence of narcotics or alcohol. (Ex. [9] at 35:19-21).

- o It was common to see people come into the jail intoxicated. . . . Ex. [9] at 70:6-14; Ex. [8] at 26:12-15; Ex. 10 at 30:17-20; Ex. 11 at 28:9-11) Despite this, the County had no standard detox protocol. (Ex. [9] at 71:3-5) (Ex. 14 at 68:7-10) (*Id*. at 67:14-19).

- o No medical evaluation would occur for intoxicated people prior to being placed in a padded or detox cell. (Ex. 11 at 28:15-17) "We would just accept them, bring them in…And we'd wait for them to sober up or come to[.]" (*Id*. at 25:20-26:1; *see also* Ex. 7 at 41:12-23, 43:8-19).

- o The County's "sleep it off" policy was consistent with training received by jailers. (Ex. 7 at 43:20-23) Nurse Hack heard "sleep it off" referred to frequently in relation to intoxicated detainees. (Ex. [9] at 72:9-12).

- Intake decisions were made by untrained personnel and without personally observing the detainee and without regard to medical stability.

  - o The County allowed nonmedical personnel (including the Sheriff and other jail administrators and supervisors) who were not present and conducted no medical evaluation to decide whether to incarcerate arrestees with serious medical conditions. Chief Deputy Garza and the Sheriff would override decisions of supervsiors [sic] and nurses regarding whether to accept someone into the jail. (Ex. [9] at 16:4-20; Ex. 11 at 15:24–16:25, 17:19–18:1).

  - o If a supervisor tried to reject someone, then the arresting officers would call Chief Garza or the Sheriff to override the decision. (Ex. 7 at 25:19-26:15; Ex. 11 at 18:23-19:12, 20:10-19) This happened "pretty frequently." (Ex. 11 at 19:5-6).

  - o There were times when the supervisor would reject someone or try to send them for medical clearance because they were too intoxicated, but Chief Garza overrode the decision and made them accept the person into the jail. (Ex. 11 at 20:2–21:4) Chief Garza or the Sheriff in fact overrode the decision to intake Cynthia. (Ex. [9] at 63:22-25; Ex. 11 at 25:8-19, 30:11-13; Ex. 14 at 48:21-24; Ex. 23 at 2).

  - o Chief Garza was in his office when he made this determination and did not come out to do any sort of evaluation on Cynthia. (Ex. [8]

15 / 24

at 33:4-11) He did not speak to anyone at the hospital, review any medical records, or even see Cynthia. (Ex. 12 at 41:17-24, 49:13-21).

- o If Chief Garza or the Sheriff ordered jailers to accept someone into the jail, jailers had to follow that order. (Ex. [9] at 36:18-19; Ex. [8] at 34:16-23; Ex. 11 at 22:2-5, 45:16-18) They never talked about sending Cynthia to another hospital and were never informed about other options they would have for a detainee like Cynthia. (Ex. [9] at 33:14-16; Ex. [8] at 35:12-16) Jailer David Garza said, in hindsight, he would not have accepted Cynthia, but he did not have any other option because he was ordered to do so. (Ex. 11 at 45:10-21) Jailer Arias did not agree with decision to intake Cynthia but was told by Chief Garza to accept her. (Ex. 7 at 28:5-20).

- Jailers were not expected, or trained, to respond to medical emergencies such that they were not observed or reported to medical personnel. And medical personnel did not make regular observations of detainees.

  - o Regarding emergencies, the County did not allow jailers to authorize transportation out of the jail for medical treatment—only a supervisor could do that. (Ex. 18 at 45:3-7[]) EMS involvement had to be cleared with the nurse. (*Id*. at 45:13-16) The nurse would contact the doctor to determine whether someone should be sent to the emergency room. (*Id*. at 45:25–46:11).

  - o Jailers made many observations of Cynthia's cell, yet never acted on any information learned from those observations, rendering the observations obsolete. ([*See*] Ex. 24).

  - o Nurse Hack was not responsible for doing and would not document any cell observations. (Ex. [9] at 19:1-4, 13-15; Ex. 17 at 30:17-22).

  - o It would also be "above and beyond" expectation for jailers to report any medical issues to the nurse. (Ex. 17 at 32:3-15).

  - o If someone were high risk, suicidal, having medical issues, or detoxing, jailers would only do more frequent cell checks, but nothing was done with the information learned from cell checks. (Ex. 10 at 33:12-25, 34:14-19) Jailers would not do anything unless an inmate made a medical complaint, even though they

16 / 24

knew that people who were suicidal or having medical issues were at higher risk. (Ex. [8] at 29:1-21; Ex. 10 at 34:20-23).

- o No one trained jailers on signs or symptoms of withdrawal or overdosing. (Ex. 10 at 31:21–32:6) No one trained jailers that people should not lie face down. (*Id*. at 54:16-18) No one trained jailers that they could or should send people who already had medical clearance for further medical evaluation if they seemed like they should not be accepted into the jail. ([Ex. 11] at 22:14-23) And no one trained jailers on things to look for in terms of medical conditions. (Ex. 17 at 31:21-24).

- • The jail was perpetually understaffed, which contributed to a failure to respond to medical emergencies.

  - o Understaffing also created difficulties in transporting detainees to the hospital. Nurse Hack did not "recall the jail being completely staffed ever." (Ex. [9] at 69:21–70:5) A woman even lost her baby because the jail had insufficient staff to take her to the hospital. (*Id*. at 77:1-8) Dr. Jose Ugarte, the jail's contract physician, believed additional medical help was needed. (Ex. 19 at 15:7-16:4, 34:16-[35:10, 35:18-23]).

  - o Nurse Hack expressed concerns to Dr. Ugarte, the Sheriff, her supervisor, and others about Dr. Ugarte not going to the jail when detainees had medical complaints or needs, but nothing was done about it. (Ex. [9] at 23:[9]-24:9[, 24:20-22]) Dr. Ugarte would tell her that she should just load up inmates in a helicopter and dump them in the Rio Grande River. (Ex. [9] at 25:14-26:19) It is with this backdrop that no one contacted Dr. Ugarte about Cynthia. (*Id*. at 68:9-12).

D.E. 93, pp. 11-22.

These circumstances constitute some evidence of widespread and pervasive customs and practices tantamount to official policies that constitute a moving force behind constitutional violations related to essential healthcare that was denied to Garcia as a pretrial detainee. This is some evidence that the jail failed Garcia at every step of the way: a meaningless intake evaluation that failed to make any attempt to understand the severity

17 / 24

of her condition; a lack of medical monitoring consistent with her condition; jailer cell checks that were not calculated to detect any health risk and that ignored the readily apparent risk of positional asphyxiation; and bureaucratic delays in seeking emergency medical treatment.

Castillo goes on to detail evidence that shows that the Sheriff, the policymaker, knew of these customs and practices and their consequences. He was fully involved in these jail operations: spending every day at the jail; conducting daily walkthroughs; being a hands-on supervisor; making intake decisions in similar cases; consulting with Nurse Hack and Dr. Ugarte regarding understaffing of medical needs; knowledge of a prior instance of a woman losing her baby due to a lack of emergency medical care; and receiving notices of TCJS noncompliance regarding cursory cell checks and inmate observations, as well as failing to classify at-risk detainees before housing them. D.E. 93, pp. 23-24 (and record citations therein). There are disputed issues of material fact concerning the existence of policies, customs, or practices behind the injury Garcia suffered.

**Legitimate Governmental Objective**. The County makes no argument in its motion (D.E. 67) that its policies are related to a legitimate governmental interest or that Castillo cannot satisfy this element. In fact, it asserted that there were only a few written policies that were all simply constitutional. D.E. 67, p. 10 ("The express policies of the jail are (1) to provide necessary medical care for inmates, (2) to complete intake forms within 12 hours of inmate arrival, and (3) to provide monitoring of inmates at least every 30 minutes"). None of those policies addressed anything regarding incarcerating detainees

18 / 24

who have medical clearance, regardless of condition at presentment. Therefore, Castillo had no reason to join issue on this element and did not do so. D.E. 93.

In its reply (D.E. 99), the County admits for the first time that it has a policy of accepting, without question, any person who is brought to the jail with a medical clearance, regardless of observable condition. And it asserts for the first time that this policy is related to a legitimate governmental interest. D.E. 99, pp. 5-9. The Court cannot accept this argument as dispositive because there is a question of fact whether such a policy can constitutionally exist. *See* D.E. 93, Ex. 22, pp. 12-13 ("Any reasonable and well-trained correctional staff in the same position would have returned Ms. Garcia to the hospital, rather than placing her in a cell at the jail.").

Moreover, Castillo argues, and the County effectively admits, that the County still has the obligation to provide necessary medical care. *See* D.E. 67, p. 10. And, as addressed more fully herein, its failure to provide care based on a prior medical opinion must involve ***reasonable*** reliance and ***actual instructions***. Even assuming, arguendo, that there is a legitimate governmental interest in accepting a detainee on the basis of a medical clearance, that does not absolve the County from providing necessary medical care once the detainee is in its custody. Therefore, the Court does not accept the County's legitimate governmental interest argument, raised for the first time in its reply, as properly developed or as dispositive.

**Conclusion**. The Court cannot conclude as a matter of law that Castillo has failed to raise a disputed issue of material fact regarding one or more de facto county jail policies

that—alone or in combination—were a moving force behind a constitutional violation with respect to Garcia's status as a detainee in need of healthcare. There are also disputed issues of material fact concerning whether there was a legitimate governmental interest in accepting Garcia on the basis of her medical clearance despite her condition at intake. The motion for summary judgment (D.E. 67) is **DENIED IN PART** to the extent that it seeks dismissal of Castillo's conditions of confinement claim.

### C. Episodic Acts or Omissions

Under an episodic acts or omissions theory, "a jail official's act or omission can give rise to constitutional liability only if he was culpable, under an appropriate legal standard, with respect to the harm to the detainee." *Hare*, 74 F.3d at 645. The Fifth Circuit stated that standard as: "a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id*. at 650. The county official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and actually draw that inference. *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020).

To extend liability to a county for that jail official's act, "a plaintiff must show the violation 'resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.'" *Garza*, 922 F.3d at 637. Here, the County sums up the task for Castillo as proving individual subjective deliberate indifference and policymaker objective deliberate indifference. D.E. 67, pp. 12-13. Castillo states that an individual's

subjective intent is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. D.E. 93, pp. 9-10 (citing *Sanchez v. Oliver*, 995 F.3d 461, 473 (5th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). "On the other hand, [w]hether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury." *Id.* at p. 10 (citing *Sanchez*, 995 F.3d at 473 (quoting *Brown v. Bolin*, 500 F. App'x 309, 312 (5th Cir. 2012)).

**Reliance**. The County's challenge to the episodic acts or omissions claim is that the jail staff did not act with deliberate indifference because "they relied on the medical clearance ***and instructions from the decedent's treating physician***." D.E. 67, p. 12 (emphasis added). As mentioned in the evidence noted above, they did not have instructions from Dr. Valmont or any other medical professional regarding Garcia's treatment. They only had the medical clearance, which states—in its totality—"This certifies that Cynthia Garcia is Medically cleared for travel and detention from CHRISTUS Spohn Hospital Kleberg." *See* D.E. 67, p. 3. It offers nothing in the way of test results, diagnosis, treatment, prognosis, or instruction of any kind. There was nothing in the medical clearance to guide county jail employees' actions.

**Subjective Deliberate Indifference**. The County also briefs cases that discuss the high bar required for subjective deliberate indifference. The Court accepts that it is beyond mere negligence or gross negligence and does not encompass medical malpractice, misdiagnosis, or differences of medical opinions. *See* D.E. 67, pp. 13-19 (citing cases). With respect to healthcare issues, Castillo can show deliberate indifference by evidence

that prison officials refused to treat Garcia, ignored her complaints, intentionally treated her incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Castillo argues that the same evidence discussed above with respect to the conditions of confinement claim applies equally to demonstrate her episodic acts and omissions claim. D.E. 93, p. 10.

There is some evidence that, at intake, law enforcement personnel and jailers expressed their belief that Garcia was not medically fit to be held at the jail. Moreover, Nurse Hack said that they should send Garcia back to the hospital and expressed that she actually feared that Garcia would become an in-custody death, communicating that concern to intake officers and her superiors. D.E. 93, Ex. 7 at 24:2–25:7; Ex. 8 at 36:1-17; Ex. 9 at 32:11-15, 35:9-12; Ex. 18 at 56:16-24; Ex. 23 at 2. She had knowledge of a substantial risk and actually made the inference that Garcia could die in custody based on her existing observable condition. Yet Nurse Hack did not conduct any medical evaluation, did not have or seek diagnostic information or treatment/discharge instructions from the hospital, did not personally monitor Garcia, and knew that jailers would provide only cursory monitoring through a window in a closed door without any medical training or obligation to intervene. Rather than attend to her obvious risks, Nurse Hack treated Garcia like they treated every other intoxicated person and simply waited for her to "sleep it off."

Likewise, Chief Garza overrode the concerns about accepting Garcia. He heard Nurse Hack's assessment and chose to disregard it. He was present at the jail, yet chose

22 / 24

not to make his own evaluation, and knew that the jail personnel would not—according to widespread and pervasive customs and practices—provide any meaningful medical assistance to Garcia. He knew Garcia would be placed in a detox cell where the only effort made on her behalf would be a medically untrained jailer peering through a window from time to time. From this evidence of record, the jury could find that Nurse Hack and Chief Garza knew that Garcia was at substantial risk for serious harm and yet failed to provide any medical treatment and essentially ignored her. That falls within the definition of subjective deliberate indifference.

The County's objective deliberate indifference is evidenced by its policies—outlined above—that show a pattern of regularly accepting into custody intoxicated persons without medical evaluation or treatment instructions, and housing them without any detox protocol or treatment—to just "sleep it off." The jail was perpetually medically understaffed, jailers were not trained in the most basic risk prevention techniques for this common circumstance and were not expected to look for, or act on, any sign of medical distress. Nurses were not expected to, and did not, make the rounds for monitoring detainees. And the physician was not consulted. These conditions had wrought dire consequences in the past. Yet no effort was made to correct them.

The County frequently encounters persons who are intoxicated and in medical distress. Yet, it routinely approaches them with deliberate indifference. Contrary to the County's assertions (D.E. 67, p. 19), the evidence shows that, consistent with its policies, it took responsibility for Garcia while she was in medical distress and did not provide

23 / 24

medical care. It did not effectively monitor Garcia or adequately train staff to properly respond to the risks of detainees like Garcia. This evidence supports a holding of objective deliberate indifference as a matter of law.

There are disputed issues of material fact with respect to the County's jail officials' subjective deliberate indifference and the record is sufficient to conclude as a matter of law that the County exhibited objective deliberate indifference through its jail operations. Therefore, the motion for summary judgment (D.E. 67) is **DENIED IN PART** with respect to its challenge to the episodic acts and omissions claim.

## CONCLUSION

For the reasons set out above, the Court **DENIES** the County's motion for summary judgment (D.E. 67) in its entirety.

**ORDERED** on April 7, 2026.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE